UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

DAWN ROWE,                              )
                                        )
              Plaintiff,                )
                                        )        No. 3:15-cv-256-TAV-CCS
v.                                      )
                                        )
UNITED OF OMAHA LIFE INSURANCE,         )
                                        )
              Defendant.                )

## REPORT AND RECOMMENDATION

This case is before the undersigned pursuant to 28 U.S.C. § 636, the Rules of this Court, and the referral Order [Doc. 18] of the Chief District Judge.

For the reasons stated herein, the undersigned will **RECOMMEND** that the Defendant's Motion for Judgment on the Administrative Record (ERISA) **[Doc. 14]** be **DENIED** and the Plaintiff's Motion for Summary Judgment **[Doc. 16]** be **GRANTED, IN PART.**

Plaintiff Dawn Rowe brought this ERISA action against Defendant United of Omaha Life Insurance Company ("Defendant"), alleging that it failed to pay Plaintiff long-term disability payments due to her under Policy No. GLTD-OALDC ("Policy") issued to Freeman Webb Company, Relators. Plaintiff alleges that the Defendant violated the Employment Retirement Income Security Act of 1974 ("ERISA") and prays for damages in the amount equal to the disability income benefits, an order requiring the Policy to pay continuing benefits in the future so long as Plaintiff remains disabled, and attorney's fees, costs, and interest.

## I.    BACKGROUND

The facts relevant to the parties' Motions for Judgment are as follows.

### A.    The Policy

The Plaintiff is a former commercial property manager who was covered under the Policy issued to Freeman Webb Company, Realtors. The Plaintiff suffers from low back pain and insomnia. The Plaintiff ceased working on November 21, 2013, and she applied for Long-Term Disability ("LTD") on January 6, 2014.

The Policy states, in pertinent part, that in order to be eligible for long-term disability benefits, an employee must meet the following definition of disability:

> **"Disability"** or **"Disabled"** means:
>
> because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred in which You are:
>> (a) Prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>
>> (b) Unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 24 months, Disability and Disabled mean You are unable to perform all of the Material Duties of any Gainful Occupation.

[Doc. 9-1 at 18].[1]

The Policy defines "Regular Occupation" as follows:

> [T]he occupation You are routinely performing when Your Disability begins. Your regular occupation is not limited to the specific position You held with the Policyholder, but will instead be considered to be a similar position or activity based on job descriptions included in the most current edition of the U.S. Department of Labor Dictionary of Occupation Titles (DOT). We have the right to substitute or replace the DOT with a service or other information that We determine of comparable purpose, with or without notice. To determine Your regular occupation, We will look at Your occupation as it is normally performed in the national economy, instead of how work tasks are performed for a specific employer, at a specific location, or in a specific area or region.

---

[1] All citations will be to Doc. 9-1, which is the Administrative Record, unless otherwise noted.

[R. at 52].

Further, the Policy defines "Material Duties" as "the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified." [R. at 51]. Finally, the Policy states:

> The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion, that the Insured Person is entitled to them. In making any decision We may rely on the accuracy and completeness of any information furnished by the Policyholder, an Insured Person or any other third parties.

[R. at 6].

## B. Plaintiff's Medical History

Plaintiff's medical history includes lower back pain associated with a surgery in 2011 and insomnia. The Plaintiff saw Crystal Gue, M.D., on July 20, 2011, for a physical evaluation. [R. 123]. She was referred from Dr. Reid's office. [R. 123]. Dr. Gue noted that the Plaintiff had been evaluated by Dr. Reid earlier that year for low back pain. [R. 123]. Dr. Gue stated that the Plaintiff reported having a cystic mass and that the Plaintiff thought the mass was located at L4 and L5. [R. 123]. The Plaintiff had a fusion to remove the mass. [R. 123]. Dr. Gue provided that the Plaintiff had done very well following surgery and was having much less pain. [R. 123]. She also noted that the Plaintiff occasionally used Tramadol "maybe 3 to 4" times a week secondary to this pain. [R. 123]. Dr. Gue stated that the Plaintiff was still having physical therapy. [R. 123]. Dr. Gue wrote a prescription for Tramadol but noted that she did not want to continue the Plaintiff on this drug and that hopefully with physical therapy, the Plaintiff would not need it in the future. [R. 123].

The Plaintiff visited with Dr. Gue again on September 19, 2011. [R. 136]. The Plaintiff reported that she experienced "a lot of problems with her low back." [R. 136]. The Plaintiff stated that Dr. Reid performed a CT scan at her last visit but an abscess or any other abnormality was not

3

noted. [R. 136]. The Plaintiff stated that she was in a lot of pain today and that the pain worsened over the weekend. [R. 136]. She reported using Mobic and Ultram on an as needed basis. [R. 136]. With respect to her low back pain, Dr. Gue wrote the Plaintiff a prescription for hydrocodone and was told that if her symptoms worsened, to report to the emergency room. [R. 136].

Subsequently, on December 8, 2011, the Plaintiff followed-up with Dr. Gue for low back pain and other medical issues. [R. 157]. Dr. Gue noted that the Plaintiff saw Dr. Barnett and was given a few Vicodin. [R. 157]. Dr. Gue encouraged the Plaintiff to contact Dr. Reid's office to schedule an appointment because the Plaintiff was "having some radiculopathy." [R. 157]. Later, on March 12, 2012, Dr. Gue noted that the Plaintiff's low back pain was not completely controlled. [R. 163]. The Plaintiff reported that when she goes to Florida and walks in sand or a tile floor, her back flared up. [R. 164]. The Plaintiff reported using hydrocodone at that time but not Flexeril because Flexeril did "not seem to work well." [R. 164]. The Plaintiff reported her pain to be 8 out of 10 but noted that pain relievers improved her physical functioning and she did not experience any side effects from her medication. [R. 165]. Dr. Gue recommended that the Plaintiff continue her present regimen. [R. 166].

On June 20, 2012, the Plaintiff visited with Dr. Gue for a follow-up. [R. 167]. The Plaintiff reported intermittent back pain. [R. 167]. The Plaintiff noted that she took one Tramadol a day and sometime used up to three hydrocodones a day "but often can go without any hydrocodone." [R. 167]. Dr. Gue refilled prescriptions for Tramadol and Naprosyn and told the Plaintiff to schedule a follow-up within four to six months. [R. 167]. Subsequently, on November 14, 2012, the Plaintiff visited with Dr. Gue, who noted as follows:

> The patient comes in today to be evaluated for worsening back pain.
> She states that over the last couple of months her back pain has
> progressively worsened. She has had chronic back pain for a long
> time and had surgery back in 2011. She is using Tramadol,

> hydrocodone, and Flexeril. She states she has had to use more medications in the last two months than she has in the last year. She does not want to have a MRI until next year if possible secondary to her high deductible. She is having some radiculopathy down her left leg but occasionally down her right leg. She is smoking more than she was previously. She states she currently is unable to work full days because of the pain.

[R. 174]. Dr. Gue noted that the Plaintiff's back was non-tender to palpation and that the Plaintiff had some stiffness with movement, along with a well-healed surgical scar. [R. 174]. Dr. Gue assessed low back pain with previous surgery. [R. 174]. They discussed getting an MRI but decided to wait until January. [R. 174]. Dr. Gue prescribed prednisone, Celebrex, and increased her dosage of Flexeril and Tramadol, and added Effexor to see if it helped with chronic pain. [Tr. 174]. Dr. Gue told the Plaintiff to follow-up in January for "probable MRI." [Tr. 174].

The Plaintiff followed-up with Dr. Gue on January 16, 2013. [R. 175]. The Plaintiff stated that since her last visit, "she ha[d] been doing very well." [R. 175]. The Plaintiff reported that Celebrex seemed to be working well in combination with other medications, but the Plaintiff noted that it was expensive. [R. 175]. Dr. Gue assessed low back pain that was improved with current medications. [R. 165]. Dr. Gue stated that she would hold off on ordering a MRI and that she would continue the Plaintiff's current medications. [R. 175]. Dr. Gue also gave the Plaintiff a low back exercise sheet, and the Plaintiff reported that she was doing some exercises on her own. [R. 175].

On March 18, 2013, the Plaintiff had x-rays taken of her lumbar spine, which were compared to the results on June 13, 2011. [R. 271]. The radiologist found as follows:

> There are 5 non rib-bearing lumbar vertebra. Anatomic alignment and vertebral body heights are preserved. Patient is status post posterior fusion of L4-L5 with interbody disc markers in place. No hardware complication. Remaining intervertebral disc spaces are preserved. Mild multilevel facet arthrosis is noted, worsened from prior examination. The paraspinal soft tissues and bilateral SI joints

> are within normal limits. Surgical clips project over the right upper
> quadrant.

[R. 271]. The radiologist opined, "No acute abnormality. Mild multilevel facet arthrosis, progress from prior examination." [R. 271].

On November 7, 2013, the Plaintiff saw Ms. Trina Lannom, a nurse practitioner working for Robert Hoyt, M.D. [R. 304]. Ms. Lannom noted that the Plaintiff had tenderness in her thoracic and lumbar palpation. [R. 304]. Ms. Lannom refilled the Plaintiff's Tramadol and hydrocodone, "which adequately control[led] her pain and improve functioning most days of the month without adverse side effects." [R. 306]. The Plaintiff reported breakthrough pain, and Ms. Lannom noted that the Plaintiff was scheduled to start physical therapy. [R. 306]. Ms. Lannom stated that the Plaintiff was advised that she would experience more pain with physical therapy but that was to be expected. [R. 306].

On November 25, 2013, the Plaintiff followed-up with Ms. Lannom to discuss her short term disability and FMLA. [R. 300]. Ms. Lannom stated that the Plaintiff was positive for back pain and had transient insominia. [R. 300-01]. Ms. Lannom noted that the Plaintiff had a back brace and a TENS unit, but they were ineffective. [R. 300]. Ms. Lannom also noted that occupational therapy was not completed but therapeutic massage therapy had been completed. [R. 300]. Ms. Lannom also noted that the Plaintiff had musculoskeletal pain with range of motion in "back flexion, extension, and lateral flexion and tenderness to thoracic and lumbar palpation." [R. 302]. Ms. Lannom noted:

> [Patient] is being seen today to advise provider that she has started the process towards long term disability as she is unable to work her designated hours at work due to chronic lumbar pain. Will send to PT for full occupational evaluation. [Patient] has complained for [the] last two months that her chronic back degeneration has led to her inability to work long hours sitting at a desk as well as affecting

her ability to carry out designated work tasks. Will work on filling out her FLMA paperwork. . . .

Disability examination will send with script today to take PT for an occupational assessment.

[R. 302].

On December 5, 2013, the Plaintiff saw Dr. Hoyt for a follow-up pain visit for facet joint osteoarthritis. [R. 296]. The Plaintiff reported that the discomfort was most prominent in her lower lumbar spine and that the pain radiated to her anterior thigh and hip. [R. 296]. The Plaintiff characterized the pain as constant, moderate in intensity, sharp, dull, throbbing, aching, burning, and stabbing. [R. 296]. The Plaintiff reported that it was a chronic problem with constant pain. [R. 296]. The Plaintiff also reported that the current episode of pain started two years ago and that the associated symptoms included stiffness, radicular bilateral leg pain and weakness of the upper and lower leg. [R. 296]. Dr. Hoyt noted that the Plaintiff had a decreased range of motion in her back and lateral flexion. [R. 298]. He also noted that she was maintaining activity. [R. 298]. Dr. Hoyt stated that the Plaintiff went to physical therapy for an evaluation, but she did not want to pay the cost involved and would like for Dr. Hoyt to perform an evaluation. [R. 298]. Dr. Hoyt told the Plaintiff that he does not conduct disability evaluations but that he would provide medical records to whoever she desired. [R. 299]. Dr. Hoyt refilled her prescriptions. [R. 299].

On January 3, 2014, the Plaintiff followed-up with Ms. Lannom. [R. 292]. The Plaintiff reported that she experienced some pain relief in her back with rest, heat, and narcotic pain medication. [R. 292]. In addition, the Plaintiff reported that the pain worsened with walking, back extension, twisting movements, hip flexion, hip extension, internal and external hip rotation, and prolonged sitting and prolonged standing. [R. 292]. Ms. Lannom noted that the Plaintiff's pill count was inaccurate and that she was "mildly over" on all her medications. [R. 294]. The Plaintiff

explained that some days her pain was well-controlled, especially since she was not working and did not need her medication as much. [R. 294]. Ms. Lannom refilled the Plaintiff's medications because the Plaintiff stated that her pain was adequately controlled, "which improve[d] her level of functioning most days without side effects." [R. 295]. The Plaintiff stated that she noticed a small improvement in her level of activity since reducing her hours at work and having time off. [R. 295].

On the same day, Ms. Lannom completed a Physician's Statement. [R. 415-16]. Ms. Lannom noted that the Plaintiff had been diagnosed with multilevel facet joint osteoarthritis and that the Plaintiff's symptoms included low back pain that radiates to her bilateral hips and thighs, and she listed transient insomnia as a secondary condition. [R. 415]. Ms. Lannom noted that x-rays had been taken and the objective findings included tenderness to the lumbar palpation, back flexion, and extension. [R. 415]. Ms. Lannom opined that the Plaintiff was not able to work as of November 7, 2013. [R. 415]. Ms. Lannom noted that the Plaintiff had been prescribed hydrocodone, Tramdol, Flexeril, and Zaleplon. [Tr. 415].

In addition, Ms. Lannom opined that the Plaintiff should not sit for extended periods without breaks or stand for extended periods. [R. 416]. Ms. Lannom also stated that the Plaintiff cannot operate motorized machinery while on narcotics. [R. 416]. Ms. Lannom noted that the Plaintiff's prognosis was fair and that the outcome had improved with physical therapy but that Ms. Lannom would continue to monitor the Plaintiff's prognosis. [R. 416]. Ms. Lannom reported that the treatment plan included continuing physical therapy and pain management. [R. 416]. Ms. Lannom opined that in an eight-hour workday, the Plaintiff was able to sit for three hours, stand for one hour, and walk for three hours. [R. 416].[2] Ms. Lannom noted that the Plaintiff reported that

---

[2] The Court notes that sitting for three hours, standing for one hour, and walking for three hours amounts to seven hours.

standing in one place caused the most discomfort. [R. 416]. In addition, Ms. Lannom stated that other activities in which the Plaintiff was restricted included the following: driving/operating motorized equipment, lifting/carrying, bending, squatting, and crawling. [R. 416]. Ms. Lannom explained that she was restricted from driving because of the pain medication and the inability to sit for long periods of time. [R. 416]. With respect to the other restrictions, Ms. Lannom explained that they caused the Plaintiff increased pain. [R. 416].

### C. Procedural History

#### (a) Initial Denial

As mentioned above, the Plaintiff completed an application for LTD benefits on January 6, 2014. [R. 408-09]. The Plaintiff reported that she was unable to perform job duties as required and that before she stopped working, her medical condition required more breaks and more pain medication. [R. 408]. The Plaintiff reported that her first day that she was unable to work was November 22, 2013. [R. 408]. The Plaintiff stated that Ms. Lannom was the first whom provided her medical attention for the current disability. [R. 409]. In addition, the Plaintiff reported that she saw Dr. Gue as a general practitioner, but the Plaintiff moved forward with pain management. [R. 408]. In addition, the Plaintiff noted that in March 2011, she saw Dr. Rad for "neuro" and for a "cyst on spine—fractured disc," but it was not the same as the current condition. [R. 409].

On February 25, 2014, the Defendant sent the Plaintiff's medical records to a nurse case manager, Julie Grancer. [R. 420]. Ms. Grancer summarized the Plaintiff's medical records and concluded that it would be reasonable to preclude the following activities:

> -Lifting/carrying > 20 pounds
> -Constant twisting and bending at the waist level
> -Operate vibratory large machinery as with a jack hammer
> -Exposure to unprotected heights
> -She would require the ability to make routine position change as needed

-She would be precluded from holding a CDL (certified driver's license)

[R. 423]. Ms. Grancer noted that the indicated activity level appears to be partially in accordance with the documentation in the file. [R. 423]. Ms. Grancer explained:

> [The Plaintiff] has been prescribed the same muscle relaxant and narcotic analgesics currently as recommended prior to the last day worked. After a couple weeks of taking narcotic analgesics and muscle relaxants[,] people build up a tolerance to the medication with generally little or no cognitive side effects as noted on exams. The [Plaintiff] displays no communicative issues and continually appears unaccompanied at exams indicative of the ability to drive. She would have issues with frequent waist bending activities as seen in yard work, vacuuming, etc.

[R. 423]. Ms. Grancer also questioned whether the plaintiff underwent a functional capacity evaluation as recommended. [R. 423].

On March 27, 2014, the Defendant also obtained an Occupational Analysis from Douglas Palmer with Palmer Vocational Services, LLC. [R. 268-69]. In preparation of his report, Mr. Palmer reviewed the job description for commercial property manager at Webb Company Relators and the Defendant's employer statement. [R. 268]. Mr. Palmer stated that based on his review of the job-related information provided and comparing this information to data available through a variety of vocational resources, the Plaintiff's occupation could be compared to a Property Manager as defined in the Dictionary of Occupational Titles ("DOT"). [R. 269]. Mr. Palmer explained:

> The material duties of this occupation primarily involve managing commercial, industrial, or residential real estate properties for clients.
>
> The physical demand characteristics of this occupation generally fall within the light exertion level, which is defined as exerting up to 20 lbs. of force occasionally, and/or up to 10 lbs. frequently, and/or a negligent amount of force constantly to lift, carry, push, pull, or otherwise move objects. Even though the amount of force may be

negligible, a job should be rated in this category if: (1) it requires standing or walking to a significant degree; OR (it requires sitting most of the time but entails pushing, pulling, or manipulating of arm or leg controls; OR (3) it requires work at a production rate/pace entailing constant pushing, pulling of materials of negligent weight.

The other physical demand characteristics/temperaments typically expected for this occupation are: having the occasional need to climb, stoop or crouch, having the frequent need to use upper extremities to reach or handle objects; the frequent need to talk with people and hear, and having the frequent need to perform activities requiring near acuity.

[R. 268].

In a letter dated April 1, 2014, the Defendant denied the Plaintiff's application for LTD benefits. [R. 247-53]. The Defendant explained the definitions of "Disability and Disabled," Material Duties," and "Regular Occupation" pursuant to the terms of the Plan. [R. 247-48]. In addition, the Defendant listed all the records that were taken under consideration and summarized the Plaintiff's medical file. [R. 248-50]. The Defendant stated that it received a copy of the Plaintiff's job description as a Commercial Property Manager from her employer and that a vocational consultant opined that the job most closely related to the occupation of Property Manager as defined in DOT. [R. 248]. The Defendant noted that a Property Manager was a light capacity occupation and that the Department of Labor defined "light work" as follows:

[E]xerting up to 20 pounds of force occasionally (Occasional: activity or condition exists up to 1/3 of the time), and/or up to 10 pounds of force frequently (Frequent: activity or condition exists 1/3 or 2/3 of the time), and/or negligible amount of force constantly (Constant: activity or condition exists 2/3 or more of the time) to move objects. Even though the weight lifted may be only a negligible amount, an occupation should be rated Light work (1) when it requires walking or standing to a significant degree; or (2) when it requires sitting most of the time, but entails pushing/pulling of arm or leg controls; and/or (3) when the occupation requires working at a production rate pace entailing the constant pushing/pulling of materials even though the weight of those materials is negligible. Note: industrial setting can be and is

physically demanding of a worker even though the amount of force
is exerted is negligible.

[R. 248-49].

The Defendant concluded:

In summary, there had not been a change in your pain or insomnia
treatment to current. You were continuously in no acute distress at
your follow up visits. Your vital signs have remained stable, which
is indicative of controlled pain. You have been prescribed the same
muscle relaxant and narcotic analgesics that you were prescribed
prior to the last date you worked. After a couple of weeks of taking
narcotic analgesics and muscle relaxants, people build up a tolerance
to these medications. The documentation on file does not support
restrictions and limitations to preclude you from performing the
Material Duties of your Regular Occupation as a Commercial
Property Manager. Therefore, no benefits are payable and your
claim has been denied.

[R. 251].

*(b) Plaintiff's Request for an Appeal*

The Plaintiff appealed the Defendant's initial denial on September 24, 2014. [R. 112]. The

Plaintiff argued that her job entailed the duties related to both a property manager and a leasing

agent, and she attached a letter by Rodney Caldwell with Caldwell Rehabilitation Consulting. Mr.

Caldwell noted that he reviewed the job description for a Commercial Property Manager and a

Leasing Consultant provided by Freeman Webb Company, as well as the Plaintiff's description of

her duties. [R. 114]. Mr. Caldwell noted that with respect to a Commercial Property Manager, one

of the essential functions of the job involves supervision and direction of on-site maintenance

contractors and personnel to maintain the properties. [R. 114]. Mr. Caldwell stated that a Property

Manager may have to enter crawl spaces in confined spaces, climb ladders to inspect roofs, and

carry ladders. [R. 114]. Mr. Caldwell stated that carrying and extending ladders required at least

medium physical exertion. [R. 114]. He noted that a Property Manager may discover problems

that require immediate action, such as moving appliances or furniture like refrigerators, book cases and desks to check for leaks and other problems. [R. 114]. Mr. Caldwell stated that these activities require at least medium exertion. [R. 114].

With respect to the job description for a Leasing Manager, Mr. Caldwell stated that the job would require lifting up to 20 pounds occasionally and up to 10 pounds frequently. [R. 114]. Mr. Caldwell stated that the listed physical demands do not include all the duties required to fulfill the essential functions of the job. [R. 114]. Mr. Caldwell stated that one of the essential functions is to inspect the condition of the model daily and arrange for necessary maintenance. [R. 114]. Mr. Caldwell continued that such inspections may involve the use of either an interior ladder or an extension ladder to inspect roofs and other elevated structures. [R. 114]. Mr. Caldwell concluded that "although the company provided job description lists light physical demands, a review of the essential functions required reveals that fulfilling all the essential functions of the job would require at a minimum medium physical demands." [R. 115].

The Plaintiff's appeal stated that the Defendant improperly categorized her work as light capacity and ignored that an individual on regular narcotic pain medication and muscle relaxants cannot and should not perform certain essential functions of the described job. [R. 112]. In addition, the Plaintiff stated that was prevented from performing one or more of the Material Duties of her Regular Occupation and that she had not been able to generate Current Earnings that exceed 99% of her Basic Monthly Earnings. [R. 113]. The Plaintiff requested that the Defendant reconsider the initial decision and review records from Dr. Gue showing that the Plaintiff's conditioned worsened over time leading up to the end of her employment. [R. 113].

*(c) The Appeal Process*

On October 23, 2014, at the request of the Defendant, Patricia Thal, a Rehabilitation Counselor and vocational Expert, conducted a Vocational Rehabilitation Review. [R. 86-90]. Ms. Thal noted that the Plaintiff was a Commercial Property Manager/Leasing Consultant and that as part of her report, she reviewed Physical Aspects of Job Form, Job Descriptions for Commercial Property Manager and Leasing Consultant, and Dr. Caldwell's Vocational Assessment. [R. 86]. In addition, Ms. Thal noted that she consulted standard vocational resources, such as DOT, the Occupational Outlook Handbook ("OOH"), the Occupational Information Network (O*NET)/Standard Occupational Classification ("SOC") coding system, as well as internet job boards, such as Indeed.com. [R. 86]. Ms. Thal summarized the Commercial Property Manager position and the Leasing Consultant job as described by the employer. [R. 87]. Ms. Thal concluded that the Plaintiff's job tasks are best represented by the DOT description, Property Manager. [R. 87]. Ms. Thal stated that the DOT described this occupation as requiring a light physical demand level with occasional, climbing, stooping, and crouching and frequent reaching, handling, and fingering. [R. 87]. In addition, Ms. Thal stated that the DOT description and tasks were substantially similar to the updated information in SOC/O*NET description of Property, Real Estate, and Community Association Managers. [R. 87]. Ms. Thal concluded:

> Based on a combination of all the research outlined above, including a 2013 O*NET survey of Occupational Experts and internet research, this occupational is most often performed at the sedentary, light, and medium levels of physical demand based on Department of Labor descriptions found in the DOT. Ample opportunities exist at all levels.

[R. 88]. Ms. Thal then defined sedentary, light, and medium work as defined by the Department of Labor. [R. 88-90].

Later, the Defendant requested that Alan Neuren, a Board Certified Neurologist and Psychiatrist, conduct a medical records review and advise if an impairment was supported from November 22, 2013, to February 20, 2014. [R. 80-82]. Dr. Neuren noted that the Plaintiff claimed to be impaired due to back pain, insomnia, and degenerative facet joint arthritis. [R. 80]. Dr. Neuren summarized the Plaintiff's medical file and found as follows:

- Insured is claiming to be impaired due to back pain. Records reference insured's having back surgery in 2011 for a reported lumbar cyst. There is reference to treatment with a Dr. Reid for the back complaints, but no records have been provided.
- The records provided consist only of treatments from two internists with no significant evaluation other than a single set of lumbar x-rays that showed prior surgical changes and mild facet arthrosis, a common finding in asymptomatic individuals in this age group. When seen in December of 2013, she was described as appearing to be in mild pain.
- Treatment has consisted primarily of chronic opiates and Tramadol which are contraindicated in the management of chronic non-malignant pain. Of note, with ongoing use of opiates tolerance rapidly develops to the sedating and cognitive side effects.
- There is lack of support for restricting or limiting activity in individuals with complaints of back pain. In the absence of significant disease such restrictions may contribute to worsening symptoms.

[R. 81]. Dr. Neuren concluded, "There is lack of support for impairment." [R. 82].

In a letter dated January 29, 2015, the Defendant stated that it was upholding the denial of the claim and no benefits were payable. [R. 65]. The Defendant stated that it had advised additional information was needed from the Plaintiff to perfect her appeal to include medical records dated January 4, 2014, to the current date and the Plaintiff's pharmacy records showing what and when medications were filled from September 1, 2013, to the current date. [R. 66]. The Defendant noted that it did not receive the documents as requested and that the decision was made as the file stands. [R. 66-67]. The Defendant noted that it requested an occupational analysis and that it was

determined that the Plaintiff's job tasks are best represented by the DOT description of a Property Manager. [R. 87]. The Defendant stated that this job requires a light physical demand level with occasional climbing, stooping, and crouching and frequent reaching, handling, and fingering. [R. 87]. In addition, the Defendant stated that the DOT descriptions were substantially similar to the updated information found in SOC/O*NET's description of Property, Real Estate, and Community Association Managers and the Defendant outlined O*NET's description. [R. 67]. The Defendant also included the description of Property, Real Estate and Community Associations Managers per the OOH. [R. 68]. Further, the Defendant provided the definitions of sedentary, light, and medium work as defined by the Department of Labor. [R. 68-69].

The Defendant also noted that the Plaintiff's medical records were referred to Dr. Neuren. [R. 70]. The Defendant summarized Dr. Neuren's report and then concluded:

> While we appreciate your opinion that [the Plaintiff] would be unable to perform her job duties, we insure her occupation as performed in the national economy and not as performed for a specific employer. As noted above, her occupational as performed in the national economy can be performed at a sedentary, light, or medium demand. The clinical evidence in [the] file does not support any functional deficits that would preclude her from performing her normal work capacity as of her claimed date of disability and forward. In addition, we have received no medical records dated beyond January 4, 2014, to support any ongoing impairment.
>
> Ms. Rowe's symptoms of pain are chronic in nature. Although she may have a chronic condition, the records do not substantiate she experienced an acute event or a change in her functional status as of November 22, 2013. The restrictions and imitations of no work are not corroborated by the medical records in [the] file.
>
> In summary, the file lacks confirmation of physical examinations, diagnostic testing, and/or medical documentation to substantiate Ms. Rowe would be unable to perform the material duties of your regular occupation. Therefore, disability is not supported. As a result, no benefits are payable, and the denial of the claim has been upheld . . .

[R. 70].

The Plaintiff filed her Complaint [Doc. 1] on June 16, 2015.

## II.  POSITIONS OF THE PARTIES

Both parties have filed competing dispositive motions. The Court will first summarize the Defendant's position because its Motion was filed first.

*(a) Defendant's Motion for Judgment on the ERISA Record*

The Defendant argues that the Plaintiff failed to meet her burden of proof regarding disability. In addition, the Defendant submits that it utilized a deliberate, principled and reasoned process for its decision. The Plaintiff responds that she is disabled because her employer cannot accommodate a sit/stand option. In addition, the Plaintiff argues that the Defendant initially denied her application for one reason, and then on appeal, denied her application for another reason. The Defendant replied that there is no evidence in the record that the Plaintiff is limited to a sit/stand option. Further, the Defendant argues that the Plaintiff obfuscates the real issue, which is that the Plaintiff cannot establish that she is disabled.

*(b) Plaintiff's Motion for Judgment on the ERISA Record*

With respect to the Plaintiff's Motion, she raises three points of contention. First, she asserts that she is unable to perform her regular occupation as it is normally performed in the national economy. In addition, she argues that the Defendant acted arbitrary and capricious by relying upon a medical consultant who never examined her. Finally, the Plaintiff argues that she was not given a chance to address Dr. Neuren's report prior to the final decision and that the Defendant provided another reason on appeal for denying her claim.

The Defendant responds that the Plaintiff is not disabled and that all the job descriptions indicate the position can be easily accommodated. In addition, the Defendant asserts that its initial denial is not inconsistent with its denial on appeal.

## III.     STANDARD OF REVIEW

Where a benefit plan gives the plan administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, the administrator's benefit determination is reviewed "under the highly deferential arbitrary and capricious standard of review." Goetz v. Greater Georgia Live Ins. Co., 649 F. Supp. 2d 802, 811 (E.D. Tenn. 2009) (quoting McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 168 (6th Cir. 2003) (internal quotation marks removed)).

If it is possible to offer a "reasoned explanation" for the decision, based on all the evidence known to the administrator, then the decision is not arbitrary and capricious. Hunter v. Caliber System, Inc., 220 F.3d 702 (6th Cir. 2000); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 381 (6th Cir. 1996). This standard is not demanding, but neither is it toothless. McDonald v. Western–Southern Life Ins. Co., 347 F.3d 161, 169, 172 (6th Cir. 2003).  Courts must scrutinize the decision to determine whether, "substantively or procedurally, [the plan administrator] has abused his discretion." Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 115 (2008).  In other words, the administrator's decision will be upheld only "if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." Glenn v. MetLife, 461 F.3d 660, 666 (6th Cir.2006).  Moreover, the Court is to limit its review to the administrative record.  Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998); Wilkins v. Baptist Healthcare Sys., 150 F.3d 609, 613 (6th Cir. 1998).

In the instant matter, the parties agree that the Policy grants discretionary authority. As mentioned above, the Policy states, "The Policyholder has delegated to Us the discretion to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy. Benefits under the Policy will be paid only if We decide, after exercising Our discretion,

that the Insured Person is entitled to them." [R. 9-1 at 6]. Accordingly, the Court finds that the arbitrary and capricious standard applies.

## IV. ANALYSIS

The Court will now turn to the parties' arguments.

*(a) Conflict of Interest*

The Plaintiff asserts that "any application of the arbitrary and capricious standard must take into account conflicts of interest held by the decision-maker." [Doc. 17 at 6].

A conflict of interest will arise when the decision-maker of which claims are covered is also the payor of those claims. Calvert v. Firstar Finance, Inc., 409 F.3d 286, 292-93 (6th Cir. 2005); Marks v. Newcourt Credit Group, 342 F.3d 444, 457 (6th Cir. 2003). It is well-established that the standard of review—that is, arbitrary and capricious—will not change because of a conflict of interest. Calvert, 409 F.3d 286, 292-93; see also Myers v. Prudential Ins. Co. of Am., 581 F. Supp. 2d 904, 909-10 (E.D. Tenn. 2008) (discussing Calvert). However, a conflict of interest is a factor to consider when determining whether the plan administrator's denial of benefits was arbitrary and capricious. Calvert, 409 F.3d at 292-93.

In the present matter, the Court finds that a conflict of interest exists. The Policy vests the Defendant with authority to make disability determinations and make payments for approved claims. [R.1, 42]. Accordingly, the Court will consider the conflict of interest in its analysis below.

The Plaintiff also states that a conflict of interest applies not only to the plan administrator but to the hired consultants and experts, citing Black & Decker Disability Plan v. Nord, 538 U.S. 822, 832 (2002) and Moon v. UnumProvident Corp., 405 F.3d 373, 381-82 (6th Cir. 2005). In Black & Decker, the Supreme Court addressed whether plan administrators were obliged to accord special deference to the opinions of treating physicians, similar to the Social Security context. Id.

19

at 825. The Supreme Court ruled that plan administrators were not obliged to accord special deference to a treating physician's opinion and noted in passing, "Nor do we question the Court of Appeals' concern that physicians repeatedly retained by benefits plans may have an incentive to make a finding of not disabled in order to save their employers money and to preserve their own consulting arrangements." Id. The Supreme Court did not rule as a matter of law that there is a conflict of interest with respect to hired consultants and experts.

In Moon, the Plaintiff is correct that the Sixth Circuit noted, "Furthermore, when a plan administrator's explanation is based on the work of a doctor in its employ, we must view the explanation with some skepticism." Id. at 381-82. However, in Moon, a doctor employed by Unum found that the plaintiff was not disabled by focusing on one minor medical report and ignoring all other medical evidence that supported the plaintiff's disability. 405 F.3d at 381-82. The Court held that Unum acted arbitrarily and capriciously in its rejection of the plaintiff's claim based solely on that report. Id. The Sixth Circuit did not create a *per se* rule that a conflict of interest exists to hired consultants or experts but simply recognized that such opinions were skeptical when the consulting physician rejects the plaintiff's disability while failing to consider the entire medical file. Accordingly, the Court declines to create such a rule.

(b)  *Defendant's Decision to Deny*

As an initial matter, although the parties disputed whether the Plaintiff's job qualified as light or medium capacity at the administrative proceeding, it appears that the parties now agree that the Plaintiff's job qualifies as light capacity work and that the job compares to a Property Manager as defined in the DOT. Here, the Plaintiff argues that she is unable to perform her regular job occupation as it is normally performed in the national economy. The Plaintiff states that light work requires a good deal of walking or standing and that it cannot be assumed that light

20

occupations can accommodate a sit-stand option. [Doc. 17 at 5]. The Defendant responds that all of the job descriptions reviewed indicate that her former position can easily accommodate different types of activities and movements and that it is not clear what the "sit-stand" arguments means. In addition, the Defendant asserts that ERISA allows a plan administrator to view the job at issue in light of accommodations that may easily be made. [Doc. 20 at 2].

In the present matter, the Court finds that the record is unclear as to whether Defendant's decision was the result of a deliberate, principled reasoning process. Here, the Policy defines "Disability and Disabled," in relevant part, as being "prevented from performing *at least one* of the Material Duties of Your Regular Occupation on a part-time or full-time basis." [R. 9-1 at 268] (Emphasis added). The parties agree that the Plaintiff's comparable job is a Property Manager as found in DOT and that the physical demand characteristics generally fall within the light exertional level. The Defendant's first vocational consultant explained that the material duties of this occupation primarily involve managing commercial, industrial, or residential real estate properties for clients. [R. 9-1 at 268]. The vocational consultant explained that the physical demand characteristics generally fall within the light exertion level, defined as:

> [e]xerting up to 20 lbs. of force occasionally, and/or up to 10 lbs. frequently, and/or a negligent amount of force constantly to lift, carry, push, pull, or otherwise move objects. Even though the amount of force may be negligible, a job should be rated in this category if: (1) it requires standing or walking to a significant degree; OR (it requires sitting most of the time but entails pushing, pulling, or manipulating of arm or leg controls; OR (3) it requires work at a production rate/pace entailing constant pushing, pulling of materials of negligent weight.
>
> The other physical demand characteristics/temperaments typically expected for this occupation are: having the occasional need to climb, stoop or crouch, having the frequent need to use upper extremities to reach or handle objects; the frequent need to talk with people and hear, and having the frequent need to perform activities requiring near acuity.

At the time of the Defendant's first denial, it had two medical opinions: (1) Plaintiff's nurse practitioner, and (2) Defendant's nurse practitioner. The Plaintiff's nurse practitioner, Ms. Lannom, found that the Plaintiff should not sit and stand for extended periods of time. Specifically, in an eight-hour work day, Ms. Lannom opined that the Plaintiff should sit for three hours, stand for one hour, and walk for three hours. Ms. Grancer, the Defendant's medical consultant, noted that the Plaintiff was precluded from lifting/carrying more than twenty pounds, constant twisting and bending at the waist level, operating vibratory large machinery as with a jack hammer, exposure to unprotected heights. [R. 9-1 at 423]. She also noted that the Plaintiff would require the ability to make routine position changes as needed and that she would be precluded from holding a CDL. [R. 9-1 at 423]. Ms. Grancer also questioned, "Did the [Plaintiff] undergo a Functional Capacity Evaluation as recommended?" [R. 9-1 at 423].

In sum, one nurse practitioner specifically limited siting, standing, and walking, and the other nurse practitioner stated that the Plaintiff needed routine position changes. In the Defendant's first denial, it asserts that the documentation on file does not support restrictions and limitations to preclude the Plaintiff from performing the material duties. However, it is unclear if the Defendant credited the limitations given by the medical consultant and/or the Plaintiff's nurse practitioner and whether these limitations would prevent the Plaintiff from performing at least one of her material duties, as "disability" is defined by the Policy. See Bailey v. United of Omaha Life Ins. Co., 938 F. Supp. 2d 736, 748 (W.D. Tenn. 2013) ("Additionally, in its two denial letters, United of Omaha spent the majority of its letter explaining the plan terms and the medical evidence it reviewed. After this explanation, it then stated simply that 'based on the above medical analysis, restrictions and limitations do not appear to be supported."). The Defendant's denial letter uses Ms. Grancer's opinion regarding the Plaintiff's controlled pain to support denying benefits, but

the Defendant fails to address whether Ms. Grancer's opinion with respect to limitations would preclude the Plaintiff from performing at least one of her material duties.

The Defendant argues that the Plaintiff presented little evidence of a disability that would preclude her from working in a sedentary or light occupation. However, both parties have submitted that the Plaintiff's occupation is classified as light. Moreover, while there may not be a significant amount of medical records, it is still unclear whether the Defendant agreed or disagreed with the opinions and/or limitations contained in the medical records. Accordingly, the Court finds the Plaintiff's argument well-taken on this point.

Moreover, the Court notes that during the appeal of the original denial, the Defendant requested that Dr. Neuren review the Plaintiff's medical file. Dr. Neuren opined that there was a lack of support of restricting or limiting activity with individuals with complaints of back pain and that in the absence of significant disease restrictions, limitations or restricting activities may contribute to worsening symptoms. The Defendant credited Dr. Neuren's opinion in its denial. Now, however, the Court is presented with three different opinions—two of which opine that the Plaintiff has some restrictions, and it is not clear to the Court which opinion the Defendant credited and whether such opinion would preclude the Plaintiff from performing all of her material duties.

Citing to White v. Standard Ins., Co., 895 F. Supp. 2d 817, 849 (E.D. Mich. 2012), the Defendant argues, "Under ERISA, an administrator vested with discretionary authority may consider workplace accommodations in determining whether an employee is totally disabled." The Court notes, however, that accommodations were not discussed in either of the Defendant's decisions. Thus, it is not clear if the administrator considered accommodations, or if the administrator opined that accommodations were even necessary.

The Plaintiff also argues that the Defendant added a new reason for its denial on appeal, i.e., "the opinion of a peer reviewer that [the Plaintiff] in fact has no restrictions and limitations at all." [Doc. 17 at 11]. The Court finds that Dr. Neuren's opinion was not a new reason but instead, it was additional evidence regarding whether the Plaintiff met the definition of "disability" per the Policy. Moreover, the Plaintiff asserts that she was not given any hint that the Defendant was reconsidering her physical ability, but the Defendant specifically requested in a letter dated October 13, 2014, for more current medical records pertaining to the Plaintiff's medical condition. The Defendant asserts that the Plaintiff never responded to the request for records, and the Plaintiff has not rebutted the Defendant's assertion.

### (c) Social Security Disability

The Defendant asserts that the Plaintiff has not provided any evidence of an award of Social Security Disability Insurance ("SSDI") benefits. The Defendant argues that it is unclear whether the Plaintiff applied for SSDI but if the Social Security Administration ("SSA") finds a plaintiff not disabled, such a decision can support an administrator's decision to deny benefits. The Plaintiff asserts that Social Security benefits are completely irrelevant because Social Security employs an "any occupation" definition of disability from the outset. The Defendant replies that the Plaintiff has not argued the SSA found her disabled and that is relevant. The Defendant states, "Arguably, it is evidence that Plaintiff has little support of disability at all." [Doc. 21 at 3].

The Sixth Circuit has held that "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." Whitaker v. Hartford Life & Accident Ins. Co., 121 F. App'x 86, 88 (6th Cir. 2005). Courts have recognized that a disability determination by the SSA is relevant in an action to determine the arbitrariness of a decision to terminate benefits under an ERISA plan. Glenn v. MetLife, 461 F.3d 660, 667 (6th

Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105 (2008). Here, the Defendant essentially argues that the failure to apply for Social Security benefits is relevant. The Court disagrees. The Defendant did not point to any evidence with respect to whether the Plaintiff applied for Social Security benefits. More importantly, the Defendant did not consider Plaintiff's alleged failure to file for Social Security benefits at the administrative level, and the Court finds it improper to address it now.

*(d) Remand*

It is well-established that if there is a problem with the plan administrator's decision making process, but it is not clear that the plan participant is entitled to benefits, the appropriate remedy is to remand. Helfman v. GE Group Life Assur. Co., 573 F.3d 383, 396 (6th Cir.2009) (remanding to plan administrator where "the integrity of the decision-making process ha[d] certainly been questioned" but "it does not appear that claimant is *clearly* entitled to benefits."); Elliott v. Metro. Life Ins. Co., 473 F.3d 613, 622–23 (6th Cir. 2006) ("[W]e cannot say that [the plan participant] is clearly entitled to benefits.... Thus, we believe that a remand to the district court with instructions to remand to [the plan administrator] for a full and fair inquiry is the proper remedy here.").

In the present matter, the Court finds that it is not clear that the Plaintiff is entitled to benefits. Accordingly, the Court recommends that the case be remanded and that on remand, the Defendant should detail non-arbitrary reasons for denying benefits. This should include at a minimum, but not be limited to, detailing its findings and decisions:

(1) As to the extent to which the Plaintiff has or has not been prevented from performing any of the material duties of her regular occupation— and if so—which ones and why;

(2) As to which medical records, medical providers, medical and/or vocational consultants and/or other medical/vocational persons Defendant relied upon or credited in reaching its decisions and why— and which ones (records, providers, *etc.*) it did not credit—and why;

25

(3) As to what if any limitations/restrictions expressed by these medical/vocational persons Defendant relied upon/credited in reaching its decisions—any why. Also, which limitations/restrictions it did not credit/rely on—and why;

(4) The extent to which the limitations credited would or would not prevent Plaintiff from performing the material duties of her regular occupation, and if so, whether specific accommodations are available.

The Plaintiff shall have 60 days from the date of remand to file her position as to the above matters and to provide any and all supporting documents.

## V.     CONCLUSION

Accordingly, the undersigned **RECOMMENDS**[3] that the Defendant's Motion for Judgment on the Administrative Record (ERISA) **[Doc. 14]** be **DENIED** and the Plaintiff's Motion for Summary Judgment **[Doc. 16]** be **GRANTED, IN PART.**  The Court recommends that the case be remanded for further review.

Respectfully Submitted,


_____s/ C. Clifford Shirley, Jr.___
United States Magistrate Judge

---

[3] Any objections to this Report and Recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Civ. P. 72(b)(2). Such objections must conform to the requirements of Rule 72(b), Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140, 106 S. Ct. 466 (1985). The district court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive or general. Mira v. Marshall, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370 (6th Cir. 1987).